544 So.2d 479 (1989)
Brenda Maline McCoy MOORE, Plaintiff-Appellant,
v.
Roderick Lesley MOORE, Defendant-Appellee.
No. 20,332-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1989.
*480 Sockrider, Bolin, Nader & Anglin by D. Rex Anglin, Shreveport, for plaintiff-appellant.
W. Charles Brown, Bossier City, for defendant-appellee.
Before HALL, SEXTON and LINDSAY, JJ.
SEXTON, Judge.
Defendant-appellant, Brenda Maline McCoy Moore, appeals a judgment granting her husband a divorce based upon the grounds of adultery and changing the original joint custody decree to provide that the father, Roderick Lesley Moore, is the primary residential parent. We affirm in part and reverse in part.

FACTS
Brenda Moore and Roderick Moore were divorced on April 15, 1988. Out of the marriage were born two children, Kiewasty (also known as Traughn), now age 12, and Kamesha, now age 4. The judgment of divorce granted the divorce in favor of Mr. Moore against Mrs. Moore based upon the grounds of adultery, and it additionally granted joint custody of the minor children to the parties with Mr. Moore being granted primary residential custody of the children. The mother had been granted primary residential custody of the children in an earlier judgment dated June 25, 1987. Mrs. Moore appeals the divorce judgment arguing two assignments of error.
Mrs. Moore first claims that the trial court placed undue emphasis on her relationship *481 with her boyfriend. She submits that she was "punished for a perceived relationship" with her male friend and that the trial court finding that the father should be given domiciliary custody of the children is in error. She argues that the court gave no apparent consideration to the fact that the three-year-old daughter might need to be with her mother and that Mrs. Moore's conduct was not so morally reprehensible or deleterious to the young children's best interest as to warrant the change in custody.
Secondly, she asserts that the evidence was insufficient to support the finding of adultery on her part as she claims to have gone to the house of a male friend, Max LeBleu, on the night in question with the intent of borrowing his truck. She claims that she parked her car in the male individual's garage and then borrowed his truck (which Max LeBleu revealed was actually his father's truck), returning it the following morning.
Gerald Baker, a clinical psychologist appointed by the court to examine the children in the case, testified that he spoke with all members of the family and interviewed the children from August through December of 1987. He noted that the son, Kiewasty Moore, called Traughn, is well-adjusted, very gregarious and outgoing. He was very cooperative and was willing to interact with Dr. Baker and the staff. Although Traughn seemed to be doing pretty well, he had trouble with allegiances between his parents. Dr. Baker did note, however, that at the time of the initial examination, Traughn was not allowed to visit with his father, and since the time of that examination, he has been allowed visitation with his father and therefore "somewhat had settled down." He concluded that Traughn was feeling more secure with the situation although experiencing some anxiety since the trial date had been set.
Kamesha, Dr. Baker noted, was distressed due to being under a great deal of strain trying to please both parents. She was somewhat confused and tended to say the right thing pertaining to each parent. Dr. Baker testified that the daughter made a statement regarding having slept with her mother and her boyfriend, and she also had seen her mother kissing her boyfriend.
Dr. Baker's conclusions regarding both children were that both were involved in conflict regarding their parents' difficulties. He felt that the children had given responses in an attempt to try to satisfy both parents by saying the right thing. He noted that it caused both of them emotional distress. Dr. Baker found the daughter to be the more confused of the two and felt that the son's stress had been more or less resolved.
Dr. Baker, however, could not find anything negative with respect to either parent. He noted that the children presented two different age ranges and sexes and had significant needs which resulted solely from these factors. He did not find anything to indicate that either parent would be detrimental to the children. He opined the children were suffering from the unresolved domiciliary and visitation situation and felt that it was important that the matter be concluded.
On cross-examination, Dr. Baker agreed that the daughter's statements regarding the sleeping arrangements may have been something that she had been told by the father or the maternal grandmother. He stated that the child indicated that both had told her a number of things with respect to her mother's relationship with her boyfriend. In this same regard, Dr. Baker testified that he had received a phone call from the boy because the youth was concerned that he had understood from his father that Dr. Baker was worried the child would be susceptible to a nervous breakdown. It was Dr. Baker's understanding that the father, in telling the boy of this possibility, stated that Mrs. Moore had told him (the father) of the problem. Both Dr. Baker and Mrs. Moore denied that there had been any discussion with respect to a nervous breakdown on the part of the boy.
Mrs. Moore testified that the minor daughter accompanied her to the house of Max LeBleu, her alleged boyfriend, on the night preceding Good Friday. She testified, *482 however, that she never spent the night at his house.
The testimony of Traughn, the minor son, indicates that he was teased at school with regard to his mother dating a white male. He testified that his mother had left him with other people to spend the night on several occasions. She would go out on weekends sometimes but not much, and sometimes she took the phone off of the hook when she would leave the house. On one occasion he did not know how to get in touch with his mother. He testified that he questioned his mother regarding whether she had a boyfriend and her response was, "None of your business. Don't be so nosey." He revealed that Max LeBleu did come by the house and that Max and his mother told him that they were going to a bank meeting. On another occasion, he testified that Mr. LeBleu came by his house and gave him a ride in his Mercedes. On cross-examination, Traughn testified that Max LeBleu offered him money for doing chores.
The testimony of Mr. Moore's mother indicated that on numerous occasions she noted Mrs. Moore going out and when she returned smelled of liquor. She testified that Mrs. Moore would not cook meals for the children. She conceded that her son also went out on occasion.
Finally, Norma Jean Carter, a friend of the family, testified that Mr. Moore stayed out late and she had, on occasion, noticed numerous bruises on Mrs. Moore's person.
In granting the change in domiciliary custody, the trial court noted in oral reasons for judgment that both parties were good parents. The court did not think that either would be detrimental to the upbringing of the children, and that there was no evidence to back up either of their claims that the other was not a good parent. The court agreed with the conclusions of the psychologist that both of the children wanted to say what pleased their parents. The court noted the statement made by the three-year-old that she slept with her mother and her boyfriend one night but also noted the statement was inconsistent with other statements she had made. The court did not specifically reach a conclusion as to the truthfulness of the statement. The trial judge did find, however, that the evidence indicated to the satisfaction of the court that Mrs. Moore did take the child with her when she visited Max LeBleu on certain occasions.
The testimony of Traughn, the minor son, was important to the trial court's decision. The court expressed concern over the fact that the son had been in a fight in school over the fact that his mother was supposed to be dating a white man. The court felt that Traughn was very conscientious in answering the court's questions and did not feel that he wanted to hurt either parent. In the court's opinion, the fact that the child would even consider that his mother had a boyfriend when she was married to his father was damaging to his well-being. Based upon these conclusions, the court therefore found that the relationship that Mrs. Moore was allegedly having with Mr. LeBleu was detrimental to the well-being of the children and indicated that there was strong evidence that what she was doing in the relationship had an adverse effect on them.
When a trial court has made a considered decree of permanent custody, the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). Where there has not been a considered decree, the heavy burden of proof of Bergeron is not applicable, but there must be a showing of a change of circumstances since the original decree. Meredith v. Meredith, 521 So.2d 793 (La. App. 2d Cir.1988). Stability of environment is a factor which should be considered in evaluating a change. Foy v. Foy, 505 So. 2d 850 (La.App. 2d Cir.1987); Dungan v. Dungan, 499 So.2d 149 (La.App. 2d Cir. 1986).
As the record is silent with respect to whether the issue of custody was previously *483 litigated, we presume it to have been uncontested. Stevens v. Stevens, 340 So.2d 584 (La.App. 1st Cir.1976). The question not having been litigated, a considered decree has not been rendered. Meredith v. Meredith, supra; Foy v. Foy, supra; Dungan v. Dungan, supra. Thus, plaintiff bears the burden of proving that a change in custody is in the best interest of the children. LSA-C.C. Art. 146(E); Meredith v. Meredith, supra; Foy v. Foy, supra; Dungan v. Dungan, supra.
In determining the best interest of the children, there must be a weighing and balancing of the factors favoring and opposing custody to the respective competing parents on the basis of the evidence in the particular case. Stewart v. Stewart, 430 So.2d 189 (La.App. 2d Cir.1983). Moral fitness of parents is but one factor, albeit an important one, to be considered when examining totality of facts, circumstances and relationships presented by a particular case. Peters v. Peters, 449 So.2d 1372 (La. App. 2d Cir.1984). The fact that a mother has a steady boyfriend who frequents her home is not sufficient reason to justify change in custody in the absence of proof that the mother's relationship with the boyfriend is having a detrimental effect on the child. Manley v. Manley, 389 So.2d 454 (La.App. 2d Cir.1980), writ denied, 395 So. 2d 341 (La.1980).
The trial court opinion reversing domiciliary custody to the father relies heavily on the relationship between Mrs. Moore and Mr. LeBleu and the effect which the trial court felt it had upon the children. In so doing, however, the trial court does not seem to have considered other important factors which favored custody by the mother. As we will subsequently discuss, the evidence in this case supports the finding of adultery on the part of the mother. However, the incident occurred on April 9, 1987, one year before trial. There is no additional evidence that the relationship between the mother and Mr. LeBleu has had a detrimental effect on the children. Although she admitted to bringing her daughter to Mr. LeBleu's house on one occasion, nothing in the record indicates that it was for anything other than a visit.
The trial court placed significant emphasis on the testimony of 11-year old Traughn who indicated that he had gotten in a fight over his mother's relationship. The evidence, however, indicates that the fight took place a year before trial and was not only over the fact that his mother was dating a white man, but was also over comments made about the child's grandmother as well.
Although Dr. Baker initially noted anxiety on the part of Traughn, he testified that as the custody situation had straightened out and Traughn was allowed to see his father, these feelings had subsided and he appeared to be less anxious. Dr. Baker also indicated that both parents were equally fit to take care of the children. The trial judge agreed. The allegations by both parties against the other were numerous but self-serving. There is no independent evidence which indicates that either parent would be unfit to properly care for these children. Although the mother is career-oriented, there is no indication that she is incapable of caring for the children or has neglected them in any way because of her career. Additionally, she retained custody of the children for ten months prior to the change in custody.
While the trial court's decision is entitled to great deference, Stephenson v. Stephenson, 404 So.2d 963 (La.1981), we are of the view that the record does not support a determination that the plaintiff has proven that the best interest of the children requires a change in the domiciliary parent. There are only two significant assertions to support a change. The major contest at trial involved Mrs. Moore's relationship with Mr. LeBleu. Mrs. Moore is entitled to relationships with the opposite sex, just as is her former husband, so long as these relationships are not detrimental to the children. Manley v. Manley, supra. The only detrimental circumstance concerns the son's fight, which seems to have had racial overtones or was also concerning the grandmother. Although the trial court was concerned that the child was affected by the fact of the mother's boyfriend, this in and of itself is insufficient as both parties will obviously become involved in new *484 relationships. The only other damaging assertion relates to the statements by the daughter that she, her mother and her mother's boyfriend had slept in the same bed together. However, this testimony was thrown into serious question by contradictory statements by the child and by evidence that both the father and his mother had made various comments to the children concerning the mother's relationship with Mr. LeBleu. Thus, we cannot find that Mr. Moore has succeeded in his burden and therefore reverse the trial court ruling in this regard.
Mrs. Moore secondly argues that the trial court erred in its finding that she committed adultery on the night of April 9, 1987.
In a divorce action, adultery may be established by circumstantial evidence which leads fairly and necessarily to the conclusion that adultery has been committed; however, the fact that a man and woman are alone together does not necessarily justify presuming that it is for romantic or sexual reasons. Wynn v. Wynn, 513 So.2d 489 (La.App. 2d Cir.1987).
In the case at hand, private investigators noted Mrs. Moore enter the garage of Max LeBleu on the night of April 9th. The investigator testified that he observed Mr. LeBleu from 5:00 p.m. to 8:00 p.m. exiting and entering his house and garage. At 8:50 p.m. on that night, Brenda Moore passed the investigators and entered Max LeBleu's residence after parking her vehicle. They observed her drive into the garage and saw the electronic door close. The next movement was observed at 6:02 a.m. on April 10th. At that time the garage door opened and Mrs. Moore exited the garage in her vehicle and went down the street. The investigators remained until 8:00 a.m. when they observed Max LeBleu exiting his residence in his Louisiana State Police uniform, enter and start his patrol car and then enter his Mercedes which he pulled into the garage. At that time he left. When questioned about the number of other vehicles at the residence, the investigator testified that he did not observe any other vehicles excepting the Mercedes, the truck and the patrol car which belonged to Max LeBleu.
When questioned as to whether or not another vehicle could have left the premises from behind the house, the investigator testified that had a car left the residence in the middle of the night, he would have heard it. He observed no traffic on the roadway. The trial court's findings concerning evidence of adultery, which is a factual issue, depend heavily on credibility evaluations which are entitled to "substantial weight" on review. Pearce v. Pearce, 348 So.2d 75 (La.1977); Wynn v. Wynn, supra.
As we appreciate Mrs. Moore's testimony, it is that she took Mr. LeBleu's father's truck, left the premises and returned it in the early morning hours of the next day. In returning, she proceeded through his house to his garage and then drove her car out from the closed garage. In other words, she left one truck which was parked in the driveway and took another truck which was behind the house and somehow drove this truck from the back of the house to the street around a full driveway without being seen by the investigators who were present. The extensive pictures introduced in evidence showing the physical circumstances of Mr. LeBleu's residence, his driveway and the rear of his premises in relation to other residences indicate that such action would be extremely difficult. The trial court accepted the testimony of private investigators and we cannot determine that these conclusions in that respect were manifestly erroneous. The record contains strong circumstantial evidence which leads fairly and necessarily to the conclusion that Mrs. Moore engaged in an adulterous relationship on April 9th. We therefore affirm the trial court's conclusion that Mrs. Moore was guilty of adultery.

DECREE
The judgment of the trial court will be affirmed in part and reversed in part. The judgment of the trial court naming RODERICK LESLEY MOORE as domiciliary parent is reversed. There is therefore judgment herein granting joint custody of the minor children, Kiewasty L. Moore and Kamesha Moore to RODERICK LESLEY MOORE and BRENDA MALINE McCOY MOORE and designating BRENDA MALINE *485 McCOY MOORE as domiciliary parent.
There will be further judgment granting the same specific visitation privileges to RODERICK LESLEY MOORE which were granted to BRENDA MALINE McCOY MOORE in that judgment of 15 April 1988 as follows:
1. Every other weekend from 7:00 p.m. on Friday until 7:00 p.m. on Sunday, the children to be picked up at 4699 Highway 80 East, Haughton, First National Bank of Shreveport.
2. Every Wednesday from 5:30 p.m. until the following morning, Thursday, at 7:45 a.m., the children to be picked up at 4699 Highway 80 East, Haughton, First National Bank of Shreveport.
3. The holidays shall be shared equally.
4. Two consecutive weeks during each of the summer months.
The judgment awarding RODERICK LESLEY MOORE a divorce is affirmed.
The costs of this appeal are assessed equally between the parties.
AFFIRMED IN PART, REVERSED IN PART and RENDERED.